Filed 6/26/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| ROSANNA MONTEMAYOR et al., | B320477 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. |
| v. | No. 19STCV37946) |
| FORD MOTOR COMPANY, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Mel Red Recana, Judge. Affirmed.

Shook Hardy & Bacon, Amir Nassihi and Andrew L. Chang for Defendant and Appellant.

Gupta Wessler, Linnet Davis-Stermitz, Jessica Garland, Jennifer Bennett; Strategic Legal Practices and Tionna G. Dolin for Plaintiffs and Respondents.

_____

Ford Motor Company (Ford) appeals from an order denying its motion to compel arbitration of Rosanna and Jesse Montemayor's causes of action for breach of warranty, violations of the Song-Beverly Consumer Warranty Act (Civ. Code, § 1790 et seq.; the Song-Beverly Act) and for fraudulent omission arising from alleged defects in a sports utility vehicle the Montemayors purchased from the dealership, AutoNation Ford Valencia (AutoNation). The central question on appeal is whether Ford as the manufacturer of the vehicle can enforce an arbitration provision in the sales contract between the Montemayors and AutoNation to which Ford was not a party under the doctrine of equitable estoppel or as a third party beneficiary of the contract.

We disagree with the decision of our colleagues in the Third District in *Felisilda v. FCA US LLC* (2020) 53 Cal.App.5th 486, 495 (*Felisilda*) that equitable estoppel applies to enable the nonsignatory manufacturer to enforce the arbitration provision in a similar sales contract. We conclude Ford cannot enforce the arbitration provision in the sales contract because the Montemayors' claims against Ford are founded on Ford's express warranty for the vehicle, not any obligation imposed on Ford by the sales contract, and thus, the Montemayors' claims are not inextricably intertwined with any obligations under the sales contract. Nor was the sales contract between the Montemayors and AutoNation intended to benefit Ford. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

A.     *The Sales Contract and Arbitration Agreement*
On June 20, 2012 the Montemayors executed a retail installment sale contract (sales contract) with AutoNation, then

2

doing business as Power Ford Valencia, for the financing and purchase of a 2013 Ford Edge sports utility vehicle (the vehicle). The four-page sales contract identified Rosanna Montemayor and Jesse Montemayor as the "Buyer" and "Co-Buyer," respectively, and referred to them collectively as "you"; Power Ford Valencia was identified as the "Seller" and referred to as "we" or "us." Paragraph 4, titled "Warranties Seller Disclaims," stated, "If you do not get a written warranty, and the Seller does not enter into a service contract within 90 days from the date of this contract, the Seller makes no warranties, express or implied, on the vehicle, and there will be no implied warranties of merchantability or of fitness for a particular purpose. [¶] This provision does not affect any warranties covering the vehicle that the vehicle manufacturer may provide." (Capitalization and boldface omitted.)

The sales contract included a half-page arbitration clause, which stated in capital letters, "Either you or we may choose to have any dispute between us decided by arbitration and not in court or by jury trial." The provision further stated, in relevant part, "Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this Arbitration Clause and the arbitrability of the claim or dispute) between you and us or our employees, agents, successors or assigns, which arises out of or relates to your credit application, purchase or condition of this vehicle, this contract or any resulting transaction or relationship (including any such relationship with third parties who do not sign this contract) shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action."

Ford was not party to the sales contract, and the contract did not refer to Ford other than identifying the make and model of the vehicle as a "2013 Ford Edge" and listing the dealer as "Power Ford Valencia."

B.    *The Complaint*

On October 22, 2019 the Montemayors filed this action against Ford and AutoNation.  Their complaint asserted six causes of action solely against Ford, including three for violations of the Song-Beverly Act (Civ. Code, § 1793.2, subds. (a)(3), (b), & (d));[1] breach of express written warranty; violation of the Magnuson-Moss Warranty Act (15 U.S.C. § 2301 et seq.); and fraudulent omission.  The complaint also asserted a single cause of action against both Ford and AutoNation for breach of the implied warranty of merchantability.

---

[1]    Civil Code section 1793.2, subdivision (a)(3), provides that "[e]very manufacturer of consumer goods sold in [California] and for which the manufacturer has made an express warranty shall: . . . [m]ake available to authorized service and repair facilities sufficient service literature and replacement parts to effect repairs during the express warranty period."  Section 1793.2, subdivision (b), provides in relevant part that "service and repair shall be commenced within reasonable time by the manufacturer or its representative," and "goods shall be serviced or repaired so as to conform to the applicable warranties within 30 days."  Section 1793.2, subdivision (d)(2), states, "If the manufacturer or its representative in this state is unable to service or repair a new motor vehicle . . . to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either promptly replace the new motor vehicle . . . or promptly make restitution to the buyer."

The complaint alleged the Montemayors purchased the vehicle from AutoNation, and the vehicle was "manufactured and or distributed by [Ford]." The complaint did not refer to the sales contract. As alleged in the first cause of action against Ford for violation of Civil Code section 1793.2, subdivision (d), and incorporated into subsequent causes of action, "In connection with the purchase, [the Montemayors] received an express written warranty, including, a 3-year/36,000 mile express bumper to bumper warranty, [and] a 5-year, 60,000 mile powertrain warranty . . . ." "The warranty provided . . . that in the event a defect developed with the [vehicle] during the warranty period," the Montemayors "could deliver the [v]ehicle for repair services to [Ford's] representative" for repair.

During the warranty period numerous defects appeared in the vehicle, including problems with the electrical system, various computer and control modules, the back-up camera, transmission and shifting, headlights, wipers, door latches, door-ajar warning lights and sound. Despite "a reasonable number of opportunities," "[Ford] and its representatives failed to commence the service or repairs within a reasonable time and failed to service or repair the [v]ehicle so as *to conform to the applicable express warranties*," and Ford refused to replace the vehicle or make restitution as required under the Song-Beverly Act. (Italics added.) The cause of action against Ford for fraud by omission further alleged Ford was "well aware" that Ford Edges manufactured between 2011 and 2017 frequently experienced defects involving the door latches and door-ajar lights and sound, creating a safety hazard, yet Ford failed to inform consumers of these defects or to remedy them.

5

The Montemayors' fifth cause of action against Ford and AutoNation for breach of the implied warranty of merchantability alleged that pursuant to Civil Code section 1792,[2] the sale of the vehicle was accompanied by a one-year implied warranty of merchantability that the vehicle "will pass without objection in the trade under the contract description," "is fit for the ordinary purposes for which such goods are used," "is adequately contained, packaged, and labelled," and "will conform to the promises or affirmations of fact made on the container or label." However, as result of the alleged defects present at the time of purchase or that developed within one year, the vehicle did not satisfy these standards of merchantability.

On November 25, 2019 Ford filed an answer to the complaint with a general denial and 45 affirmative defenses, including that "[t]he purchase or lease agreement for the subject vehicle, signed by [the Montemayors], includes an agreement to arbitrate." AutoNation also answered. The following day Ford and AutoNation filed a notice of removal to federal court. On April 13, 2020 Ford and the Montemayors filed in federal court a stipulation of dismissal without prejudice of the Montemayors' cause of action under the Magnuson-Moss Warranty Act, and on April 21 the Montemayors filed a motion to remand the case to

---

[2]    Civil Code section 1792 provides, "Unless disclaimed in the manner prescribed by this chapter, every sale of consumer goods that are sold at retail in this state shall be accompanied by the manufacturer's and the retail seller's implied warranty that the goods are merchantable. The retail seller shall have a right of indemnity against the manufacturer in the amount of any liability under this section."

state court.  On or around June 22, 2020 the case was remanded to the trial court.

C.    *Motion To Compel Arbitration*

On October 28, 2021 Ford and AutoNation jointly filed a motion to compel arbitration and to stay the action in the trial court.[3]  They argued the arbitration provision of the sales contract was a valid and enforceable agreement to arbitrate under the Federal Arbitration Act (9 U.S.C. § 2) and California law.  Further, the entire action—including the causes of action asserted solely against Ford—should be ordered to arbitration (even though Ford was not a party to the sales contract) under the doctrine of equitable estoppel as articulated by the Third District in *Felisilda, supra*, 53 Cal.App.5th at page 495.  The court in *Felisilda* concluded the vehicle purchasers' Song-Beverly Act claim against both the manufacturer and the dealership could be compelled to arbitration based on an arbitration provision in the sales contract between the purchasers and the dealership, explaining, "Under the doctrine of equitable estoppel, 'as applied in "both federal and California decisional authority, a nonsignatory defendant may invoke an arbitration clause to compel a signatory plaintiff to arbitrate its claims when the causes of action against the nonsignatory are 'intimately founded in and intertwined' with the underlying contract obligations.'"" (*Ibid*.)

Ford and AutoNation also argued Ford was a third party beneficiary of the arbitration provision because the provision

_____

[3]    AutoNation identified itself as Magic Acquisition Corp. d/b/a AutoNation Ford Valencia.

applied to disputes arising from the "'purchase or condition'" of the vehicle or "'any transaction or relationship'" resulting from the contract. Therefore, they argued, "it is clear from the plain language of [the sales contract] that it was intended to cover the exact type of claims asserted by [the Montemayors] against non-signatories such as Ford."

On January 7, 2022 the Montemayors filed their opposition and dismissed AutoNation from the action without prejudice. The Montemayors argued Ford and the Montemayors did not enter into an agreement to arbitrate, and Ford dealerships such as AutoNation are independent sellers, not agents of Ford. Further, the doctrine of equitable estoppel under *Felisilda, supra*, 53 Cal.App.5th at pages 495 to 496 did not apply to the Montemayors' claims against Ford because the claims were not ""'intimately founded in and intertwined with'"" the sales contract with AutoNation. To the contrary, the sales contract explicitly acknowledged the separate existence of a manufacturer's warranty and disclaimed any such warranties made by the dealership in the "Warranties Seller Disclaims" provision. The Montemayors also argued Ford was not a third party beneficiary to the sales contract because the contract did not evidence an express or implied intent of the parties to benefit Ford. Further, Ford waived any right to compel arbitration by engaging in conduct inconsistent with an intent to arbitrate, including by conducting discovery in the trial court for more than a year before seeking to compel arbitration.[4]

---

[4]    The parties conducted discovery during the 16 months after the action was remanded from federal court and before Ford and AutoNation moved to compel arbitration. The Montemayors

8

In a declaration supporting their opposition, the Montemayors attached Ford's 2013 Model Year Warranty Guide (warranty guide) contained in a booklet summarizing the three-year, 36,000-mile "bumper to bumper" warranty and five year, 60,000-mile powertrain warranty for new vehicles. The warranty guide referred to a program for voluntary mediation and nonbinding arbitration of disputes arising from the express warranty.

In its reply Ford argued the dismissal of AutoNation without prejudice did not render *Felisilda, supra*, 53 Cal.App.5th 486 inapplicable or prevent Ford's enforcement of the arbitration provision under the doctrine of equitable estoppel. Ford noted that although *Felisilda* involved a Song-Beverly Act claim against both the dealership and manufacturer, and the dealership alone filed the motion to compel arbitration, the *Felisilda* plaintiffs, like the Montemayors, later dismissed the dealership (albeit after the motion to compel was granted but prior to the appeal). (*Id.* at 489.) The dealership's ultimate absence as a party did not affect the Court of Appeal's conclusion that the purchasers' warranty claims arose from the sales contract. (*Id.* at pp. 496-499.)

D.     *The Trial Court's Ruling*

After a hearing, on February 7, 2022 the trial court granted Ford's motion to compel arbitration of the Montemayors' cause of action for breach of the implied warranty of merchantability and

---

asserted as part of their waiver argument that Ford moved to compel arbitration only after the Montemayors served a motion to compel production of documents concerning the vehicle's service history and Ford's safety bulletins.

9

denied the motion as to the remaining causes of action.[5]  In an 18-page statement of decision, the court considered the applicability of *Felisilda, supra*, 53 Cal.App.5th 486 to the Montemayors' complaint.  The court reasoned *Felisilda* involved a single cause of action for violation of the Song-Beverly Act asserted against both the dealership and vehicle manufacturer, and therefore, under *Felisilda* the Montemayors were equitably estopped from avoiding arbitration of their implied warranty claim asserted against both Ford and AutoNation.  However, *Felisilda* did not control the Montemayors' remaining causes of action against Ford based on the express manufacturer's warranty because the sales contract was not mentioned in the complaint, there was no reasonable inference the express warranties underlying the causes of action against Ford arose from the sales contract, and the Montemayors had "establish[ed] that Ford has a separate Express Warranty Booklet for the subject vehicle, which contains no binding arbitration provision."  The trial court concluded, "[I]t cannot be said that the [s]ales [c]ontract is the 'source of the warranties at the heart of this case' . . . [and] it cannot be concluded that the claims against Ford are 'intimately founded in and intertwined' with the [s]ales [c]ontract obligations."  (Quoting *Felisilda*, at pp. 495-496.)

The trial court also found Ford could not enforce the arbitration provision as a third party beneficiary because the

---

[5]    The trial court held Ford did not waive its right to arbitration by its delay in bringing its motion to compel.  The court severed the implied warranty cause of action and ordered the arbitration stayed pending resolution of the court action.  On April 18, 2022, shortly after filing this appeal, the Montemayors dismissed the implied warranty cause of action.

10

arbitration provision was limited to "'[a]ny claim or dispute'" between the Montemayors and AutoNation, or its "'employees, agents, successors or assigns.'" Ford "fail[ed] to show that it is a member of the class of parties for whose benefit the [sales contract] was made," and it therefore failed to meet its burden of proof to show standing as third party beneficiary.

Ford timely appealed.

## DISCUSSION

A.     *Governing Law and Standard of Review*

Code of Civil Procedure section 1281.2 requires the trial court to order arbitration of a controversy "[o]n petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party to the agreement refuses to arbitrate such controversy . . . if it determines that an agreement to arbitrate the controversy exists." Accordingly, the threshold question is whether there is an agreement to arbitrate. (*American Express Co. v. Italian Colors Restaurant* (2013) 570 U.S. 228, 233 ["arbitration is a matter of contract"]; *Pinnacle Museum Tower Assn. v. Pinnacle Market Development (U.S.), LLC* (2012) 55 Cal.4th 223, 236 [""A party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.""]; *Trinity v. Life Ins. Co. of North America* (2022) 78 Cal.App.5th 1111, 1120 ["As the language of this section makes plain, the threshold question presented by every petition to compel arbitration is whether an agreement to arbitrate exists."].)

Under state and federal state law, there is a public policy in favor of arbitration. (*Morgan v. Sundance, Inc.* (2022) __ U.S.

11

___, 142 S.Ct. 1708, 1713; *OTO, L.L.C. v. Kho* (2019) 8 Cal.5th 111, 125 [acknowledging strong public policy favoring arbitration under state law]; *DMS Services, LLC v. Superior Court* (2012) 205 Cal.App.4th 1346, 1352 (*DMS Services*) [recognizing strong state and federal policy favoring arbitration].)  However, "'[e]ven the strong public policy in favor of arbitration does not extend to those who are not parties to an arbitration agreement or who have not authorized anyone to act for them in executing such an agreement.'" (*Jensen v. U-Haul Co. of California* (2017) 18 Cal.App.5th 295, 300 (*Jensen*); accord, *Ford Motor Warranty Cases* (2023) 89 Cal.App.5th 1324, 1331 (*Ford Warranty*); *DMS Services*, at p. 1352 [with limited exceptions, "''one must be a party to an arbitration agreement to be bound by it or invoke it'''"].)

Where, as here, the facts are undisputed, we review the denial of a motion to compel arbitration de novo.  (*OTO, L.L.C. v. Kho, supra*, 8 Cal.5th at p. 126; *Ford Warranty, supra*, 89 Cal.App.5th at p. 1331.)  Likewise, "[i]n the absence of conflicting extrinsic evidence, '[w]hether and to what extent [nonsignatories] can also enforce the arbitration clause is a question of law, which we review de novo.'" (*Jensen, supra*, 18 Cal.App.5th at p. 300; accord, *Jenks v. DLA Piper Rudnick Gray Cary US LLP* (2015) 243 Cal.App.4th 1, 8 ["'Our de novo review includes the legal determination whether and to what extent nonsignatories to an arbitration agreement can enforce the arbitration clause'"]; *DMS Services, supra*, 205 Cal.App.4th at p. 1352 [same].)

B.      *Ford Cannot Enforce the Arbitration Agreement as a Nonsignatory to the Sales Contract Based on the Doctrine of Equitable Estoppel*

Ford contends it had a right to compel arbitration based on the sales contract between the Montemayors and AutoNation under the doctrine of equitable estoppel, and the trial erred in distinguishing this case from *Felisilda, supra*, 53 Cal.App.4th at page 495. In *Ford Warranty*, our colleagues in Division Eight of this district recently considered Ford's equitable estoppel argument in the context of dealership sales contracts that had identical arbitration provisions to the ones in *Felisilda* and here.[6] (*Ford Warranty, supra*, 89 Cal.App.5th at pp. 1333-1335.) The court declined to follow *Felisilda* and concluded Ford could not invoke equitable estoppel to compel arbitration of the plaintiffs' Song-Beverly Act and related claims asserted only against Ford to address defects in the purchasers' vehicles. (*Ford Warranty*, at p. 1334.) We too decline to follow *Felisilda* and adopt the reasoning in *Ford Warranty*.

In *Ford Warranty, supra*, 89 Cal.App.5th at page 1329, each plaintiff purchased a vehicle manufactured by Ford from a dealership in Southern California. The purchasers signed a form retail installment sale contract with the dealerships to finance their vehicle purchases; Ford was not a party to the contracts or named in the contracts. (*Ibid.*) In each contract, as here, the dealership expressly disclaimed any warranties but stated the disclaimer did "'not affect any warranties covering the vehicle

---

[6]     In *Ford Warranty*, multiple lawsuits by purchasers of a specific Ford model, alleging the same defects, were administered as a coordinated proceeding. (*Ford Warranty, supra*, 89 Cal.App.5th at p. 1330.)

13

that the vehicle manufacturer may provide.'" (*Id.* at p. 1330.) The arbitration provision in the sales contracts provided (as in this case) that "'either you or we'" could elect to arbitrate, in relevant part, "'[a]ny claim or dispute . . . between you and us or our employees, agents, successors or assigns, which arises out of or relates to . . . [the] condition of this vehicle, this contract or any resulting transaction or relationship (including any such relationship with third parties who did not sign this contract). . . .'" (*Ibid.*, capitalization and boldface omitted.) The purchasers experienced problems with the transmissions in their vehicles and sued Ford under various theories, including violations of the Song-Beverly Act, the Magnuson-Moss Warranty Act, breach of implied warranty, and fraudulent inducement. (*Ibid.*)

Affirming the trial court's order denying Ford's motion to compel arbitration, the court in *Ford Warranty* rejected Ford's argument that the purchasers' claims were intimately founded in and intertwined with the obligations imposed on Ford under the sales contracts, as the court held in *Felisilda* in concluding equitable estoppel applied. (*Ford Warranty, supra,* 89 Cal.App.5th at p. 1333.) The *Ford Warranty* court explained, "That the *Felisilda* plaintiffs and the dealer agreed in their sale contract to arbitrate disputes between them about the condition of the vehicle does not equitably estop the plaintiffs from asserting [the manufacturer] has no right to demand arbitration." (*Ford Warranty*, at p. 1334, italics omitted.)

The *Ford Warranty* court agreed with *Felisilda* that "[e]quitable estoppel would apply if the plaintiffs had sued [the manufacturer] based on the terms of the sale contract yet denied [the manufacturer] could enforce the arbitration clause in that

14

contract." (*Ford Warranty, supra*, 89 Cal.App.5th at p. 1334.) But the court disagreed with *Felisilda*'s conclusion that "'the sales contract was the source of [the manufacturer's] warranties at the heart of [the] case.'" (*Ford Warranty*, at p. 1334, quoting *Felisilda, supra*, 53 Cal.App.5th at p. 496.) To the contrary, "manufacturer vehicle warranties that accompany the sale of motor vehicles without regard to the terms of the sale contract between the purchaser and the dealer are independent of the sale contract." (*Ford Warranty,* at p. 1334.)

"'"[A] nonsignatory defendant may invoke an arbitration clause to compel a signatory plaintiff to arbitrate its claims when the causes of action against the nonsignatory are 'intimately founded in and intertwined' with the underlying contract obligations."'" (*DMS Services, supra*, 205 Cal.App.4th at p. 1354; accord, *Ford Warranty, supra*, 89 Cal.App.5th at pp. 1332-1333.) As we explained in *DMS Services*, "The reason for this equitable rule is plain: One should not be permitted to rely on an agreement containing an arbitration clause for its claims, while at the same time repudiating the arbitration provision contained in the same contract." (*DMS Services,* at p. 1354; see *Jensen, supra*, 18 Cal.App.5th at p. 306 ['"The fundamental point' is that a party is 'not entitled to make use of [a contract containing an arbitration clause] as long as it worked to [his or] her advantage, then attempt to avoid its application in defining the forum in which [his or] her dispute . . . should be resolved.'"]; *Goldman v. KPMG, LLP* (2009) 173 Cal.App.4th 209, 220 ["a signatory to an agreement with an arbitration clause cannot '"have it both ways"'; the signatory 'cannot, on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the

15

other hand, deny arbitration's applicability because the defendant is a non-signatory'"].)  However, "'[e]ven if a plaintiff's claims "touch matters" relating to the arbitration agreement, "the claims are not arbitrable unless the plaintiff relies on the agreement to establish its cause of action."'"  (*Jensen*, at p. 306.)

We look to the facts alleged in the complaint to determine whether the Montemayors' claims against Ford are dependent on and inextricably intertwined with the obligations imposed by the sales contract.  (*Ford Warranty, supra*, 89 Cal.App.5th at p. 1333; *DMS Services, supra*, 205 Cal.App.4th at p. 1354; *Goldman v. KPMG, LLP, supra*, 173 Cal.App.4th at pp. 229-230.)  They are not.  As discussed, the Montemayors allege as part of each cause of action against Ford at issue on appeal that Ford's obligations arose out of its express written warranty, not the sales contract.  As the *Ford Warranty* court explained with respect to similar allegations, "[P]laintiffs' claims are based on [Ford's] statutory obligations to reimburse consumers or replace their vehicles when unable to repair in accordance with its warranty. . . . Not one of the plaintiffs sued on any express contractual language in the sale contracts."  (*Ford Warranty,* at p. 1335.)  Moreover, the "sale contracts include no warranty, nor any assurance regarding the quality of the vehicle sold, nor any promise of repairs or other remedies in the event problems arise.  To the contrary, the sale contracts disclaim any warranty on the part of the dealers, while acknowledging no effect on 'any warranties covering the vehicle that the vehicle manufacturer may provide.'"  (*Ibid.*)  "In short, the substantive terms of the sale contracts relate to sale and financing and nothing more."  (*Ibid.*)

Ford contends the Montemayors' claims are inextricably intertwined with the sales contract because the claims concern

the condition of the vehicle sold by AutoNation, and the arbitration agreement specifically applies to the purchase and "condition of this vehicle." But this argument conflates the concept of "but for" causation with a determination whether the Montemayors' claims are founded on obligations imposed on Ford under the sales contract. To be sure, the Montemayors would not have sued Ford for the defective condition of the vehicle *but for* the sale of the vehicle by AutoNation pursuant to the sales contract. And Ford provided an express warranty to the Montemayors as a result of the sale.[7] But that does not mean Ford's obligation to provide a non-defective vehicle under its separate express warranty is in any way founded on an obligation imposed by the sales contract or is intertwined with those obligations.

In *DMS Services, supra*, 205 Cal.App.4th at pages 1356 to 1357, we rejected a similar argument made with respect to a cause of action asserted by plaintiff DMS against the third-party administrator of DMS's workers' compensation claims (ZSC) for mishandling claims. The trial court granted ZSC's motion to compel arbitration based on the arbitration provision in a separate insurance agreement between DMS and its insurer (to which ZSC was a nonsignatory), finding DMS's claims against ZSC were inextricably intertwined with the separate insurance agreements. We issued a writ of mandate directing the superior

---

[7] Civil Code section 1791.2, subdivision (a)(1), defines an "'[e]xpress warranty'" as "[a] written statement arising out of a sale to the consumer of a consumer good pursuant to which the manufacturer . . . undertakes to preserve or maintain the utility or performance of the consumer good or provide compensation if there is a failure in utility or performance."

court to vacate its order compelling arbitration, explaining as to ZSC's argument, "This argument confuses the concept of 'claims founded in and intertwined with the agreement containing the arbitration clause' with but-for causation." (*Id*. at pp. 1348-1349, 1356-1357.) Although ZSC's breach of its administration contract with DMS caused DMS to owe more money to the insurer under the insurance agreements, DMS did not allege ZSC breached the insurance agreements, and therefore, DMS's claims against ZSC were not founded in or intertwined with the insurance agreements. (*Id*. at pp. 1356-1357.)

The same analysis applies here—the fact the Montemayors purchased the defective vehicle from AutoNation pursuant to the sales contract, and as a result of their purchase they received separate express warranties from Ford, does not mean their causes of action against Ford based on those express warranties are founded in the sales contract. Ford's but-for argument that "[w]ithout a purchase, the Montemayors would lack any basis for their fraud claims" based on Ford's knowledge of the defects similarly fails.

Further, we disagree with *Felisilda* that the language in the arbitration provision referencing "third parties who do not sign this contract" provides a basis for nonsignatory manufacturers to compel arbitration of claims brought by vehicle purchasers. (See *Felisilda, supra*, 53 Cal.App.5th at p. 498.) We agree with *Ford Warranty, supra*, 90 Cal.App.5th at page 1334 that this language refers to the subject matter of covered claims, not the scope of who may enforce the arbitration provision. As discussed, the arbitration provisions in *Ford Warranty* and *Felisilda* (and here) required arbitration of claims and disputes arising from the sales contract and "'any resulting transaction or

relationship (including any such relationship with third parties who do not sign this contract).'" (See *Ford Warranty,* at p. 1334, quoting *Felisilda,* at p. 498.) As the *Ford Warranty* court reasoned, the parenthetical language referring to third-party nonsignatories was a "delineation of the *subject matter* of claims the purchasers and dealers agreed to arbitrate," but the purchasers clearly agreed only to arbitrate disputes between "'you and us,'" that is, with the dealership. (*Ford Warranty*, at pp. 1334-1335.) In other words, "[t]he 'third party' language in the arbitration clause means that if a purchaser asserts a claim against the dealer (or its employees, agents, successors or assigns) that relates to one of these third party transactions, the dealer can elect to arbitrate that claim. It says nothing of binding the purchaser to arbitrate with the universe of unnamed third parties." (*Id.* at p. 1335.)

The Montemayors' causes of action against Ford are explicitly based on allegations of "an express written warranty, including a 3-year/36,000[-]mile express bumper to bumper warranty" that the Montemayors alleged they received "[i]n connection with the purchase" of the vehicle. The trial court found the Montemayors provided evidence (which is undisputed) of Ford's express warranty in the warranty booklet attached to their opposition to the motion to compel arbitration. And the sales contract disclaimed any warranties while recognizing there could be a separate manufacturer's warranty. Because "manufacturer vehicle warranties that accompany the sale of motor vehicles without regard to the terms of the sale contract between the purchaser and the dealer are independent of the sale contract," equitable estoppel does not apply. (*Ford Warranty*, *supra*, 89 Cal.App.5th at p. 1334.)

19

We recognize the Montemayors sued Ford and AutoNation, whereas the purchasers in *Ford Warranty* only sued the manufacturer, not the dealerships that signed the sales contracts. (*Ford Warranty, supra*, 89 Cal.App.5th at p. 1329.) And in *Felisilda, supra*, 53 Cal.App.5th at page 491, as here, the purchasers sued both the dealership and the manufacturer for violations of the Song-Beverly Act based on allegations the manufacturers failed to promptly replace the plaintiffs' defective vehicle or make restitution. But whether vehicle purchasers file suit against only the manufacturer, or the manufacturer and the car dealer, does not affect the analysis of whether a cause of action against the manufacturer may be compelled to arbitration.

It is clear from the complaint that the causes of action alleged against Ford for breach of express warranty and violations of the Song-Beverly Act are predicated on Ford's express warranty, not any alleged wrongdoing by AutoNation. The cause of action for fraudulent omission similarly arises from Ford's alleged knowledge and failure to disclose or remedy the defective door system, not any obligation imposed on Ford under the sales contract.

C. *Ford Was Not a Third Party Beneficiary of the Sales Contract*

Ford contends the trial court erred in finding it could not enforce the sales contract's arbitration provision because it was not an employee, agent, successor, or assign of AutoNation—the only third parties referenced in the arbitration provision. Ford argues the universe of third party beneficiaries who may enforce a contract is broader than the parties listed in the arbitration provision, and the trial court failed to apply the multifactor test

20

enunciated in *Goonewardene v. ADP, LLC* (2019) 6 Cal.5th 817, 830 (*Goonewardene*) to determine third party beneficiary status. We agree with *Ford Warranty, supra*, 89 Cal.App.5th at page 1340 that applying the *Goonewardene* test, Ford is not a third party beneficiary of the dealership's sales contract.

"""A third party beneficiary is someone who may enforce a contract because the contract is made expressly for his benefit.""" (*Ford Warranty, supra*, 89 Cal.App.5th at p. 1336; accord, *Pillar Project AG v. Payward Ventures, Inc.* (2021) 64 Cal.App.5th 671, 677; see Civ. Code, § 1559 ["A contract, made expressly for the benefit of a third person, may be enforced by him. . . ."].) """The test for determining whether a contract was made for the benefit of a third person is whether an intent to benefit a third person appears from the terms of the contract.""" [Citation.] '[T]he "mere fact that a contract results in benefits to a third party does not render that party a "third party beneficiary."""' (*Pillar Project*, at p. 677; accord, *Ford Warranty*, at pp. 1336-1337 ["the parties to the contract must have *intended* the third party to benefit"]; *Jensen, supra*, 18 Cal.App.5th at pp. 301-303.)

In *Goonewardene*, the Supreme Court held that in considering third party beneficiary contract claims, a court should "carefully examine[] the express provisions of the contract at issue, as well as all of the relevant circumstances under which the contract was agreed to, in order to determine not only (1) whether the third party would in fact benefit from the contract, but also (2) whether a motivating purpose of the contracting parties was to provide a benefit to the third party, and (3) whether permitting a third party to bring its own breach of contract action against a contracting party is consistent with the objectives of the contract and the reasonable expectations of the

21

contracting parties." (*Goonewardene, supra*, 6 Cal.5th at p. 830; accord, *Ford Warranty, supra*, 89 Cal.App.5th at p. 1337.) "All three elements must be satisfied to permit the third party action to go forward." (*Goonewardene*, at p. 830.)

In *Ford Warranty, supra*, 89 Cal.App.5th at page 1338, the Court of Appeal analyzed the plaintiffs' sales contracts with the dealerships, and, focusing on the first and second *Goonewardene* elements, the court concluded the contracts "reflect no intention to benefit a vehicle manufacturer under *Goonewardene.*" Further, "nothing in the sale contracts or their arbitration provision offers any direct 'benefit' to [Ford]." (*Ford Warranty*, at p. 1338.) Based on our review of the sales contract between the Montemayors and AutoNation and the allegations of the complaint, we agree with *Ford Warranty*. Apart from a single reference in the sales contract identifying the make and model of the vehicle to be purchased and financed as a Ford Edge (and identification of the seller as Power Ford Valencia), the form sales contract is generic, without any reference to Ford, and there is nothing in the contract language that supports an inference Ford had an interest in the contract.

Ford argues, as it did in *Ford Warranty*, that it "benefits from arbitration as an efficient means of dispute resolution," and "the arbitration provision's broad language expressly encompassing claims arising out of relationships or transaction 'with third parties who do not sign this contract'" shows the agreement was intended to benefit Ford. We again agree with *Ford Warranty*, which rejected this argument, observing that Ford failed to address how it specifically benefited from the arbitration provision where the "direct benefits are expressly limited to those persons who might rely on it to avoid proceeding

22

in court—the purchaser, the dealer, and the dealer's employees, agents, successors or assigns." (*Ford Warranty, supra*, 89 Cal.App.5th at p. 1338.) The fact the arbitration provision identified several categories of non-parties who were subject to the arbitration provision (employees, agents, successors, and assigns) undermines the argument the language envisioned that disputes arising from third-party relationships would endow unnamed third parties outside of those categories standing to demand arbitration. Indeed, Ford's argument, if accepted, would mean any nonparties with whom the Montemayors might have a dispute relating to the vehicle or its purchase, including parties whose existence or relationship the Montemayors could not have contemplated, could claim they are intended beneficiaries of the arbitration agreement simply because they would benefit from arbitration.

Moreover, there is "no indication that a benefit to [Ford] was the signatories' 'motivating purpose' . . . in contracting for the sale and purchase of a Ford vehicle." (*Ford Warranty, supra*, 89 Cal.App.5th at pp. 1338-1339, citing *Goonewardene, supra*, 6 Cal.5th at p. 830.) "The manifest intent of the parties was to buy, sell and finance a car, and to allow either the purchaser or the dealer to compel arbitration of the specified categories of disputes between them, or between the purchaser and any of the dealer's 'employees, agents, successors or assigns.'" (*Ford Warranty*, at p. 1339; see *Ngo v. BMW of N. Am., LLC* (9th Cir. 2022) 23 F.4th 942, 947 ["[T]he vehicle purchase agreement in question was drafted with the primary purpose of securing benefits for the contracting parties themselves. In such an agreement, the purchaser seeks to buy a car, and the dealership and assignees seek to profit by selling and financing the car.

Third parties are not purposeful beneficiaries of such an undertaking."].)

The Montemayors and AutoNation agreed in the sales contract on terms for the financing and purchase of the vehicle from AutoNation, and they agreed to arbitrate disputes between them arising out of the credit application, purchase, or condition of the purchased vehicle.  In no way was the sales contract "made expressly for the benefit of a third person."  (Civ. Code, § 1559.)

## DISPOSITION

The order denying Ford's petition to compel arbitration is affirmed.  The Montemayors are entitled to recover their costs on appeal.


FEUER, J.


We concur:


PERLUSS, P. J.                ESCALANTE, J.*

---

*        Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.